IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-cv-597-LCB

| | | |
|---|---|---|
| JENNIFER DUNBAR, President of the Cabarrus Republican Women, | ) ) ) | |
| Plaintiff, | ) ) | BRIEF IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING |
| v. | ) ) ) | ORDER AND MOTION FOR PRELIMINARY INJUNCTION |
| ADDUL RAHMAN EL ALI, individually and in his official capacity as Chairman of the Cabarrus County Republican Party; *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**NATURE OF THE MATTER**

At this point, Plaintiff Jennifer Dunbar and countless of other women in Cabarrus County have one—and only one—hope for relief from continued discrimination on the basis of sex: this United States District Court.

Plaintiff is President of the Cabarrus Republican Women ("CRW") and, by virtue of that office, she is entitled to a seat on the Executive Committee of the Cabarrus County Republican Party ("County Party"). Despite the fact that North Carolina statutory law specifically designates the County Party's Executive Committee as a body with the immense power to select both nominees and office holders when vacancies occur, the County Party (wrongly) believes it is not prohibited from engaging in invidious discrimination,

including on the basis of sex, when it fills the Executive Committee or, as is the issue here, seeks to exclude a member like Mrs. Dunbar. So, the County Party generally, and its current Chairman Addul Ali specifically, do just that: discriminate on the basis of sex. This discrimination is an issue that has been present in the County Party for years, but it has become worse under Chairman Ali. Mrs. Dunbar is one of the few challenging it, and she is paying the price.

Because Mrs. Dunbar is a strong woman, who will not let her organization be dominated by men in the County Party, Chairman Ali has targeted her for removal from the Executive Committee. Making the nebulous charge of "gross inefficiency," a mostly male subgroup of the Executive Committee has notified Mrs. Dunbar that the issue of whether to remove her from the Executive Committee will be voted on a meeting to be held ***tonight (August 2, 2022) at 6:30 pm***.

Mrs. Dunbar, both individually and through her counsel, has appealed to the leadership of the North Carolina Republican Party to intervene. Sadly, these efforts have been to no avail. In the last week, her lawyer has sent the State Party leadership three letters on this issue—each of which has been wholly ignored by them. This Court is the only avenue Mrs. Dunbar has left to prevent the irreparable harm that will result from her removal from the County Party's Executive Committee.

2

Thus, to prevent an Executive Committee from unconstitutionally removing a member because of her sex, Mrs. Dunbar respectfully makes this application for a temporary restraining order to be followed by entry of a preliminary injunction.

## STATEMENT OF FACTS

There has long been a problem with male members of the Cabarrus County Republican Party's leadership making sexist comments, criticizing and denigrating women's political events, and trying to prevent women's events (including a booth at the County Fair) from even occurring. (Ex. A: Decl. of Jennifer Dunbar at ¶¶ 7, 16 ("Dunbar Decl.").) The result has been a two-tiered system wherein men are treated more favorably by the Cabarrus County Republican Party than women, especially when it comes to placing individuals in positions of power. (*Id.* ¶ 7.)

In a practice accelerated by Chairman Ali, the County Party has placed less qualified men in positions of authority in the Party. (*Id.* ¶ 22.) Some of these men have been teenagers or in their early 20s, and they have lacked substantial real-life experience either generally or in politics specifically. (*Id.*) Far more qualified women have been passed over for these positions in favor of these men. (*Id.*) This attitude has certainly not meant that all women are excluded from positions in the County Party. Those women who are accepted

into party positions, though, are not treated equally and must submit to the will of the male leadership, especially Chairman Ali. (*Id.*)

This sex discrimination has been especially pronounced toward the Cabarrus Republican Women, a federated Republican club, affiliated with the North Carolina Federation of Republican Women. (*Id.* ¶ 8.) The North Carolina Federation of Republican Women ("NCFRW") is an organization separate from the North Carolina Republican Party, though the two entities do, of course, work together closely to advance the causes of the Republican Party generally. (*Id.*)

There is also a North Carolina Federation of Republican Men, ("NCFRM"), which has a similar structure as the NCFRW and a similar relationship with the North Carolina Republican Party. (*Id.* ¶ 9.) While these two groups are often referred to as auxiliary organizations, the North Carolina Republican Party does not exercise governance or control over either the NCFRM or the NCFRW, as they are considered separate and distinct entities with their own leadership structures, rules, procedures, budgets, and organizational formalities. (*Id.*)

Following the North Carolina State Republican Party's Plan of Organization, the Cabarrus County Republican Party's Plan of Organization has long provided a seat on its Executive Committee to the President of the CRW and similarly provided a seat to the chairman or president of the local

men's auxiliary. (*Id.* ¶ 10.) Under the Cabarrus County Republican Party's Plan of Organization, the President of the CRW holds her seat on the Executive Committee *ex officio* and by virtue of being the President of the county Republican women's organization, not due to any separate appointment or election to the Executive Committee by the leaders or membership of the County Republican Party. (*Id.* ¶ 11.) The granting of a seat on the County Party's Executive Committee to the President of the Republican Women does not give the County Party any right or authority to govern the actions of the Republican Women, as it remains a separate and distinct organization from the Cabarrus County Republican Party. (*Id.* ¶ 12.)

The County Party knew, however, the incoming President in 2019 would be more vocal and involved than prior CRW presidents, who had generally kept their distance. (*Id.* ¶ 13.) Because this CRW President could be expected to insist on her equal rights as a member of the Executive Committee, the male leadership of the County Party resisted and delayed seating her for *four months*, even though it immediately seated the then 18-year-old President of the Republican Men's Club. (*Id.*) During the four months of delay, Defendants demanded a copy of the CRW's charter. It is believed no similar request was made of the Republican Men's Club. (*Id.* ¶ 14.)

In November 2021, Mrs. Dunbar was unanimously elected President of the CRW. (*Id.* ¶ 15.) After learning this news, Chairman Ali expressed great

5

frustration to many people and used expletives like the "f-word" in his outbursts, because he knew that she, too, would not stand for second-class treatment on the Executive Committee. (*Id.*) When the meeting at which she was to assume her seat on the Executive Committee commenced, he took the Executive Committee (excluding Mrs. Dunbar) into a closed session for approximately fifteen minutes before reluctantly agreeing to her being seated. (*Id.*)

The County Party has even shown favor to Unaffiliated men over Republican women. (*Id.* ¶ 17.) In a 2019 city council race, two members of the Executive Committee openly endorsed and supported the Unaffiliated male candidate over the Republican woman candidate, but these two Executive Committee members did not receive any form of party discipline or rebuke from the County Party. (*Id.*) Chairman Ali (who was then in leadership, but not yet chairman) defended their actions and helped prevent any consequences from befalling the Executive Committee members who had supported the non-Republican man. (*Id.*) Of note, the two arguably "disloyal" Executive Committee members were both women, but they were disloyal in the "right way"—that is, by supporting a man over a woman. (*Id.*)

Emblematic of the County Republican Party's crumbling organization, it printed only 1500 sample ballots for 2020 General Election, a woefully inadequate supply that was quickly depleted. (*Id.* ¶ 18.) A female Republican

6

candidate printed her own sample ballots, at her own expense. (*Id.*) In retaliation for her actions, Defendant Kevin Crutchfield, a member of the Executive Committee, changed the locks on the local Party headquarters, thereby prohibiting her from having access to the headquarters and preventing her from getting her campaign supplies that were inside. (*Id.* ¶ 19.) Furthermore, members of the County GOP leadership defamed the female candidate by falsely claiming she had stolen sample ballots belonging to the County Party, and Defendant Parish Moffit was sent to a precinct polling place in an effort to intimidate her and take her own sample ballots away from her. (*Id.*)

More recently, in the 2022 primary election, Chairman Ali provided very strong support to the male candidate over a female candidate in the Republican primary for a District Court judgeship. (*Id.* ¶ 20.) Even though the male candidate was the incumbent judge, many voters supported the female candidate, not only based on an assessment of relative qualifications, but also because the male candidate would be required to resign his position approximately fifteen months into his four-year term, thereby unnecessarily creating a vacancy due to North Carolina's mandatory retirement age for judges. (*Id.*)

Chairman Ali also has specifically engaged in practices that were demeaning to women. For example, he has a longtime practice of attending

7

functions hosted by the Cabarrus Republican Women, often bringing a number of people with him.  (*Id.* ¶ 21.)  Neither Mr. Ali nor any of the others he brings with him will pay an admittance fee, and Mr. Ali will often dismissively tell the women working the admissions table words to the effect of, "I'll get that to you later."  (*Id.*)  Despite his promises on these occasions, he typically does not ever pay the Cabarrus Republican Women for admission to its events.  (*Id.*)  CRW members have seen this and remarked that it makes them feel demeaned because they would never think of going to a County Party or Men's Club event without paying the admissions fee.  (*Id.*)

Chairman Ali has moreover been threatening to women.  Lisa Matthews is a former Cabarrus County resident, who became involved in a property dispute with the County in her role as a member of a charter school board.  (Decl. of Elizabeth Matthews ¶¶ 5-6 ("Matthews Decl.").)  Ali called her to make direct threats, saying that he would personally make it difficult for her to live in the County, and that she "had no idea what could be done" to her and her family.  (*Id.* ¶ 6.)  Chairman Ali said to others that Ms. Matthews did not "know how to do what she's told."  (*Id.* ¶ 8.)  Ms. Matthews felt like she was specifically targeted because she was a woman in a strong leadership position who would not simply submit to what he demanded.  (*Id.* ¶ 9.)

8

### *Specific Targeting of Mrs. Dunbar*

Chairman Ali has now taken specific aim at Mrs. Dunbar. He recently organized several members of the Executive Committee to issue an "official notice" that was emailed to Mrs. Dunbar on July 18, 2022. The individual Defendants named in this lawsuit were listed as having "signed" the notice. (Dunbar Decl. ¶ 4 & Ex. 1.) The notice then lists the four alleged bases of Mrs. Dunbar's "gross inefficiency" as follows:

    a. Defendants complain that the Cabarrus Republican Women will be hosting a forum for school board candidates and allowing all Republican candidates to attend, instead of excluding those candidates the County Party has not endorsed;

    b. The second charge alleges that it is "gross inefficiency" for the CRW to host a forum for school board candidates at all (even though it would be using its own resources and members to do so);

    c. The third charge alleges that Mrs. Dunbar "took it upon [her]self to use [her] official capacity as a member of this [Executive] committee to make a public comment" regarding an incident that occurred June 6; and

9

d. Finally, the exact nature of the fourth charge is hard to discern, but the gist appears to be that at unspecified times since November 2021 Mrs. Dunbar has made generally negative comments, including words to the effect of not being "on the same team as the Executive Committee," to fellow members of the Executive Committee.

Of note, the president of the Cabarrus County Republican Men's Club has allowed non-party endorsed Republican school board candidates to speak during at least one of his club's events, and this action has not brought any obvious adverse response from Defendants against him.

### Need for Immediate Relief

It could not be clearer, of course, that the result of tonight's hearing is a *fait accompli*. The Executive Committee will all but certainly vote to remove Mrs. Dunbar if it is allowed to vote, and it will have done so with no legitimate basis whatsoever.

There is danger in Mrs. Dunbar losing her seat on the County Party Executive Committee, even if for only a time, because important decisions related to the November 2022 elections will soon be made. Moreover, if there is a vacancy in an elected office or on the ballot that requires being filled by the Cabarrus County Executive Committee during that time, she will be deprived of her *statutory right* to participate in that process.

10

### *Justification for Delay in Seeking Relief*

The fact that this motion comes on the day of the meeting to consider removing Mrs. Dunbar is not due to inattention to this matter on her part. As the timeline set out in counsel's declaration (attached hereto as Exhibit C) shows, Mrs. Dunbar was misled at several points over the last two weeks, which made her think the matter was going to be settled. As late as yesterday, counsel was unsure whether the State Party was going to intervene to resolve the situation amicably. Only in the last day did it become apparent that there was no other option but to seek judicial relief.

## QUESTION PRESENTED

Whether Plaintiff should be granted a TRO and then preliminary injunction preventing her from being removed from the Executive Committee of the Cabarrus County Republican Party?

## ARGUMENT

Plaintiffs seeking a TRO or preliminary injunction under Fed. R. Civ. P. 65(a) "must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014); *see Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "While plaintiffs seeking preliminary injunctions must demonstrate that they are

likely to succeed on the merits, they 'need not show a certainty of success.'" *League of Women Voters*, 769 F.3d at 247 (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). When the government bears the burden of proof on an issue, as in a challenge under the First Amendment, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

Mrs. Dunbar can easily satisfy each of these elements and should be issued a TRO followed by a preliminary injunction.

## I. MRS. DUNBAR IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIMS.[1]

### A. DEFENDANTS' ACTIONS VIOLATE THE EQUAL PROTECTION CLAUSE.

#### 1. Because of the Powers Granted under North Carolina Law, Political Party Executive Committees are Subject to Constitutional Limitations.

In the Twentieth Century, federal courts began closely examining how the organization and functioning of political parties perpetuated racial discrimination. Thus, federal courts struck down primary election schemes by parties that discriminated on the basis of race. *Terry v. Adams*, 345 U.S. 461, 62-63 (1953) (plurality opinion); *Smith v. Allwright*, 321 U.S. 649, 656-57 (1944); *Nixon v. Condon*, 286 U.S. 73, 88-89 (1932). These cases reasoned that

---

[1] Mrs. Dunbar limits this motion to Counts I and IV of her Complaint only.

12

the state unconstitutionally endorses and adopts discrimination when it accepts onto its ballots the results of racially discriminatory primaries. *See Smith*, 321 U.S. at 664.

Beyond these so-called "white primary cases," the U.S. Supreme Court has also found that a political party's county-based scheme for selecting nominees violated the principle of one person, one vote. *Gray v. Sanders*, 372 U.S. 368, 374-75 (1963). And, it has found unconstitutional a requirement that voters pay a registration fee to participate in a primary election. *Morse v. Republican Party of Va.*, 517 U.S. 186, 197-99 (1996); *see Bullock v. Carter*, 405 U.S. 134, 148-49 (1972) (striking down Texas law requiring that candidates in primary elections pay a filing fee to be placed on ballot).

Though courts are not inclined to meddle with the internal affairs of a political party generally, when state law grants political parties special rights and privileges related to the nomination of candidates and ballot access, the parties' procedures under those laws constitute state action, subject to constitutional limitations and protections. *See Gray*, 372 U.S. at 374 ("[T]he action of this [political] party in the conduct of its primary constitutes state action within the meaning of the Fourteenth Amendment."); *Rockefeller v. Powers*, 74 F.3d 1367 (2d Cir. 1995) (reviewing constitutionality of state enacted scheme for delegates to Republican Party Convention); *Montano v. Lefkowitz*, 575 F.2d 378, 383 (2d Cir. 1978) (Friendly, J.) ("New York's

13

delegation to the various parties of the right to nominate candidates for special elections renders the party selection process state action."); *see also Bullock*, 405 U.S. at 140 ("The filing-fee requirement is limited to party primary elections, but the mechanism of such elections is the creature of state legislative choice and hence is 'state action' within the meaning of the Fourteenth Amendment.").

North Carolina law regarding the power of County Party Executive Committees is just such an example of special rights and privileges that, once conferred by state law, come with a requirement that they be discharged in a manner consistent with the United States Constitution. Under North Carolina election law, County Party Executive Committees elect the individuals to fill vacancies in such offices as State Senate and State Representative, *see* N.C. Gen. Stat. § 163-11, and in filling certain vacancies on the ballot occurring after a nomination but before the election, *see* N.C. Gen. Stat. § 163-114. The powers given by state law to these County Party Executive Committees is therefore enormous and, in some cases, their actions constitute the direct selection of an official for the balance of the prior officeholder's term. *See Smith*, 321 U.S. at 663 ("The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party."). These laws in fact grant more direct power, and thus implicate greater state action, than simply

14

conducting a primary, since in some cases the Executive Committee is literally naming the new officeholder.

By excluding Mrs. Dunbar from a process of this nature for discriminatory reasons because of her sex, Defendants are effecting a gender gerrymander of the Executive Committee for those times it may be called upon to exercise these statutory duties. Defendants, though, would have this Court rule that, notwithstanding this important statutory power, political parties could exclude members from their Executive Committees based on factors such as race or sex. Fortunately, the Supreme Court has made clear that the Constitutions forbids such a result.

This suit then is not asking the Court to intervene in an intraparty dispute, but rather to preserve the constitutional integrity of a process state statutory law has already put in place for the election of the people's representatives and other government officials.

### 2. Defendants' Attempt to Remove Mrs. Dunbar Violates the Equal Protection Clause's Protections against Sex Discrimination.

Mrs. Dunbar is being targeted for removal from her position because she is a woman. Defendants' actions therefore violate the Equal Protection Clause, which is enforceable pursuant to 42 U.S.C. § 1983 and which protects individuals against intentional, arbitrary discrimination. U.S. Const., amend.

15

XIV, § 1 (providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws").

To show a claim of sex discrimination under the Equal Protection Clause, a plaintiff must show she was "treated differently from others with whom [she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination" as well as that "the disparity was not justified under the appropriate level of scrutiny." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020). Title VII's analytical framework can be instructive for claims of sex discrimination under the Equal Protection Clause. *See, e.g., Wilcox v. Lyons*, 970 F.3d 452, 462 (4th Cir. 2020) ("Title VII's antidiscrimination provision overlaps the ambit of the Equal Protection Clause, and we have applied a similar framework in analyzing workplace protected-characteristic discrimination claims under each[.]").

Here, Mrs. Dunbar is qualified for her position on the Executive Committee. The County Party's Plan of Organization makes her a member of the Executive Committee by virtue of her office as President of the CRW. Moreover, the evidence shows she is a talented and hard-working party volunteer. (Dunbar Decl. ¶ 3; Matthews Decl. ¶¶ 3-4.)

The fact that Defendants have formally charged her with the purported offense of "gross inefficiency" constitutes an admission by them that they can only remove her "for cause." But, when Defendants' allegations are examined,

they crumble. In the first two charges, they take issue with the CRW holding a Republican candidates forum—this, of course, is what political organizations do. That is effectiveness, not inefficiency. As to the question of not excluding the non-party endorsed candidates from the CRW event, the Republican Men's Club has held at least one event where non-endorsed candidates presented, and no discipline has come to him.

The other charges all relate to the ability of Mrs. Dunbar to express an opinion different from that of the Party Chairman. For a party chairman who has previously defended those who backed the election of an Unaffiliated man over a Republican woman, these charges sound less like wanting party loyalty and more like an antiquated belief that women should simply do as they are "told." Ms. Matthews' declaration goes so far as to describe how Chairman Ali used that description of her, which she understood to be a sex-based stereotype due to her being a woman in a position of authority, who was taking a position opposed to him.

Such behavior is consistent with Chairman Ali's dismissive attitude toward CRW events, where he refuses to pay and even allows others to enter without paying, causing the women volunteering to feel demeaned and insulted. "Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and

17

overbroad stereotypes about the relative abilities of men and women." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 130-31 (1994).

That Chairman Ali could secure the backing of other Executive Committee members for his effort to oust Mrs. Dunbar is not surprising when the history of the County Party is considered. Women, and the CRW, have had difficulty with the County Party for years. The County Party has tried to stop its events, subjected them to criticism, and even delayed seating the President of the CRW for *four months*, even though it immediately seated an 18-year-old men's club chairman at the same time. Indeed, younger, less qualified men have been placed in positions of authority, while more experienced women have been passed over by the County Party.

The weakness in the charges against Mrs. Dunbar shows that they are mere pretext for seeking to remove her from her seat and the reason is she is a strong woman. And, removing her from her seat because she is a strong woman cannot satisfy intermediate scrutiny.

## B. MRS. DUNBAR IS ENTITLED TO HER SEAT ON THE EXECUTIVE COMMITTEE UNDER THE COUNTY PARTY PLAN OF ORGANIZATION.

The Cabarrus County Republican Party's Plan of Organization vests the President of the Cabarrus Republican Women with a right to a seat on the County Party's Executive Committee. A particular president, once seated, may only lose her seat upon the occurrence of certain events, none of which has

18

occurred here. (*See* Ex. 2 to Dunbar Decl. at 6 ("In addition to the members of the County Executive Committee identified in paragraph a above, the President or Chairman of a Federated Cabarrus County Chapter of the following organizations shall serve as a voting member of the County Executive Committee: . . . Republican Women's[.]").)

Defendants are nonetheless threatening to unlawfully unseat Mrs. Dunbar from the Executive Committee and have manifested a clear and unmistakable intent to unseat her. Absent judicial relief, it is likely Defendants will remove Mrs. Dunbar, thereby depriving her of her position on the Executive Committee. Therefore, equitable relief preventing her removal is warranted.

## II. MRS. DUNBAR WILL SUFFER IRREPARABLE HARM WITHOUT ISSUANCE OF AN INJUNCTION.

"Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters*, 769 F.3d at 247 (citations omitted). Ultimately, Mrs. Dunbar risks losing her seat on the Executive Committee when it will be called upon to exercise its statutory powers related to nomination of replacement candidates or officeholders, and thus it is a voting right she seeks to protect.

As such, the threat of irreparable harm to Mrs. Dunbar is pronounced and merits relief from this Court.

19

## III. THE BALANCE OF HARDSHIPS WEIGHS IN MRS. DUNBAR'S FAVOR.

As the Fourth Circuit has recognized, a defendant "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely found to be unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). The actions taken by Defendants here are likely to be unconstitutional, meaning the balance of hardships weighs in her favor. Furthermore, even assuming Defendants were to ultimately prevail, the notice that alleges charges against Mrs. Dunbar identifies no realistic harm resulting from her presence on the Executive Committee, whereas her loss of constitutional and statutory rights would be unrecoverable.

## IV. ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST.

Enjoining enforcement of Defendants' ban on Ms. Dunbar is in the public interest because it is always in the public interest to uphold constitutional rights. *Giovani Carandola, Ltd.*, 303 F.3d at 521; *see Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.") (citing *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001)); *Thompson v. Hayes*, 748 F. Supp. 2d 824, 833 (E.D. Tenn. 2010) ("[T]here is a public interest in protecting First Amendment rights.").

## V.   SECURITY SHOULD NOT BE REQUIRED FOR ISSUANCE OF AN INJUNCTION.

Though Rule 65(c) generally requires a plaintiff to post security for issuance of a preliminary injunction, a District Court may waive the bond requirement in its discretion. *See Pashby*, 709 F.3d at 332. Waiver of bond may be particularly appropriate where "the restraint will do the defendant no material damage[.]" *Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (citations omitted).

Defendants here are at no risk of financial or other material injury from the granting of an injunction to Mrs. Dunbar. Indeed, the rights she seeks to vindicate are intangible, constitutional rights related to the right to vote, which the law is especially solicitous to protect from being made contingent on a voter's ability to pay, *cf.* U.S. Const., amend. XXIV, § 1 ("The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay poll tax or other tax."). Therefore, she respectfully asks that the Court either waive the bond requirement or make it nominal, given that she is an ordinary citizen.

## CONCLUSION

Mrs. Dunbar and innumerable other women need this Court's immediate help, not just to prevent her unconstitutional removal from a body that North Carolina law vest with great power, but also to make clear to County and State Party leaders alike they are not a law unto themselves and that, while they have much freedom in their internal governance, invidious discrimination on the basis of race or sex will be rectified by this Court.

WHEREFORE, Mrs. Dunbar respectfully prays for a temporary restraining order and preliminary injunction prohibiting Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction from engaging in any effort to remove Mrs. Dunbar from her seat on the Executive Committee of the Cabarrus County Republican Party (including, but not limited to, considering at any meeting whether to remove her and/or holding a vote on that question) and otherwise interfering with her exercise of rights as a member of the Cabarrus County Republican Party Executive Committee until entry of a final judgment in this case.

Mrs. Dunbar further prays for such other and further relief as this Court may deem just and proper.

Respectfully submitted, this the 2nd day of August, 2022.

/s/B. Tyler Brooks
B. Tyler Brooks (N.C. Bar No. 37604)
Attorney for Plaintiff Jennifer Dunbar
LAW OFFICE OF B. TYLER BROOKS, PLLC
P.O. Box 10767
Greensboro, North Carolina 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535
Email: btb@btylerbrookslawyer.com

23

## CERTIFICATE OF WORD COUNT

The undersigned counsel certifies that the foregoing brief complies with Local Civil Rule 7.3(d) in that, according to the word count feature of his word processing software, it contains less than 6,250 words, excluding those parts that are allowed to be excluded by the Rule.

/s/B. Tyler Brooks
B. Tyler Brooks

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically on August 2, 2022. It has also been e-mailed to the *pro se* defendants listed below.

/s/B. Tyler Brooks
B. Tyler Brooks

**SERVED:**

Addul Ali
Jack Lambert
Clay Maguire
Benita Conrad
Scott Elliot
Parish Moffitt
Kevin Crutchfield
Darrin Gamradt
Anita Brown
Mary Ingram
Betty Lapish
Britt McIntyre
Jacob Abel
Robert Freeman, Jr.
Cabarrus County Republican Party (c/o Chairman Addul Ali)

*Defendants*

25