IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-cv-00597-LCB-JLW

| | | |
|---|---|---|
| JENNIFER DUNBAR, President of the Cabarrus Republican Women, | ) ) ) | |
| Plaintiff, | ) ) | PLAINTIFF'S AMENDED COMPLAINT AND |
| v. | ) ) | JURY DEMAND |
| ADDUL RAHMAN EL ALI, individually and in his official capacity as Chairman of the Cabarrus County Republican Party; JACK LAMBERT, individually and in his official capacity as Vice Chairman of the Cabarrus County Republican Party; CLAY MAGUIRE, individually and in his official capacity as Secretary of the Cabarrus County Republican Party; and the CABARRUS COUNTY REPUBLICAN PARTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Jennifer Dunbar, President of the Cabarrus Republican Women, files this Complaint against the above-named defendants (collectively, "Defendants") and respectfully alleges, upon information and belief, as follows:

## INTRODUCTION

1.     This is a case about pervasive sex discrimination against women by the Cabarrus County Republican Party that has become so egregious it has now deprived a longtime activist of her County Party leadership position and smeared her good name.

2.     Defendant Addul Ali ("Defendant Ali" or "Chairman Ali") is the current Chairman of the Cabarrus County Republican Party.  He seems to have a problem with women—or at least, with women who wish to be treated as equals, and specifically with Plaintiff Jennifer Dunbar, President of the Cabarrus Republican Women ("CRW").  His actions continue a recent pattern by leadership of the Cabarrus County Republican Party.

3.     Mrs. Dunbar holds an *ex officio* seat on the Cabarrus County Republican Party's Executive Committee due to her presidency of the Republican Women.

4.     In recent years, certain male leaders in the Cabarrus County Republican Party, including Chairman Ali, have manifested hostility to the CRW.  In 2019, the County Party even unjustifiably refused to seat the CRW's duly elected president as an *ex officio* member of the County Party's Executive Committee for four months, while at the same time immediately seating the (18-year-old male) president of the Republican Men's club on the Executive Committee.

5.     Against this background of blatant sex discrimination, on July 18, 2022, Mrs. Dunbar received by email an "official notice" from the Secretary of the Cabarrus County Republican Party.  It was signed by Chairman Ali and a mostly male selection of members of the County Party's Executive Committee. The "official notice" required Mrs. Dunbar to appear on August 2, 2022, before

2

the Executive Committee to defend herself against ambiguous charges of "gross inefficiency," which—when distilled to their essence—really assert nothing more than that Mrs. Dunbar is guilty of not submitting herself and the Cabarrus Republican Women to Chairman Ali's will.

6.     Appeal was made, even in the days prior to the filing of this complaint, to the leadership of the North Carolina Republican Party for intervention in this matter.  Inexplicably, the State Party declined to act.

7.     Political parties are not purely private entities.  To the contrary, federal courts have a long history of regulating the manner in which they operate, given the power that state law often grants parties in administering the electoral system.  In particular, courts have been committed to rooting out and remedying invidious discrimination by political parties in the electoral process.

8.     The present case presents such an instance of invidious discrimination based on sex by the leadership of the Cabarrus County Republican Party.

## THE PARTIES

9.     Plaintiff Jennifer Dunbar is a citizen and resident of Cabarrus County, North Carolina.  She is the current President of Cabarrus Republican Women, a federated Republican club, affiliated with the North Carolina Federation of Republican Women.  She brings this case to vindicate her rights,

3

the rights of the CRW, and the rights of the women who will succeed her in office.

10.     Upon information and belief, Defendant Addul Ali is the current Chairman of the Cabarrus County, North Carolina, Republican Party, and a citizen and resident of Mecklenburg County, North Carolina, even though he is registered to vote in Cabarrus County.  He is sued in both his individual and official capacities.

11.     Defendant Jack Lambert is the current Vice Chairman of the Cabarrus County, North Carolina, Republican Party, and a citizen and resident of Cabarrus County, North Carolina.  He is sued in both his individual and official capacities.

12.     Defendant Clay Maguire is the current Secretary of the Cabarrus County, North Carolina, Republican Party, and a citizen and resident of Cabarrus County, North Carolina.  He is sued in both his individual and official capacities.

13.     Defendant Cabarrus County Republican Party comprises as members all registered Republicans in Cabarrus County, North Carolina.  It is governed by the *Plan of Organization of the Republican Party of Cabarrus County, North Carolina.*  It is the entity officially recognized as the County Republican Party by the North Carolina Republican Party and by North Carolina elections officials.

4

14. Defendants were acting under color of state law at the time of the events that give rise to the causes of action asserted herein and continue to act under color of state law.

15. Defendants approved of, directed, and/or ratified the acts, policies, practices, customs, and/or procedures of their personnel that deprived and are depriving Mrs. Dunbar of her rights as set forth in this complaint.

16. Plaintiff and all of the Defendants are capable of suing and being sued under state and federal law.

17. Each of the natural persons named as parties is over the age of 18.

## JURISDICTION AND VENUE

18. This Court may properly exercise personal jurisdiction over the parties.

19. The Court has both general and specific jurisdiction over Defendants.

20. This Court has federal question jurisdiction over Mrs. Dunbar's claims under federal law pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

21. Mrs. Dunbar's state law claims are properly before this Court pursuant to 28 U.S.C. § 1367(a) because those state law claims are so related to the claims in the action that are within the Court's original jurisdiction that

5

Case 1:22-cv-00597-LCB-JLW   Document 17   Filed 01/13/23   Page 5 of 33

they form part of the same case or controversy under Article III of the United States Constitution.

22.     This Court is authorized to grant a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

23.     This Court is authorized to grant Mrs. Dunbar's prayer for injunctive relief pursuant to Fed. R. Civ. P. 65.

24.     Venue is properly laid in this court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because it is a judicial district in which a defendant resides as well as a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

25.     This action has been timely filed prior to the running of the applicable statutes of limitations and repose, and all claims of the amended complaint properly relate back to the filing of the original complaint.

26.     Any and all conditions precedent to the bringing of this suit have been satisfied, and Mrs. Dunbar's claims are ripe for review and decision.

## FACTS

### *A History of Sex Discrimination*
### *by the Cabarrus County GOP*

27.     The Cabarrus County Republican Party's problem with sex discrimination worsened under Chairman Ali, but it did not begin with him.

28.     In fact, some of the Party's problems with sex discrimination in recent years can be traced to before 2017 (a time when Chairman Ali was still a Democrat and not even affiliated with the Cabarrus County Republican Party).

29.     There has long been a problem with male members of the local GOP leadership making sexist comments, criticizing and denigrating women's political events, and trying to prevent women's events from even occurring.

30.     The result has been a two-tiered system wherein men are treated far more favorably by the Cabarrus County Republican Party than women, especially when it comes to placing individuals in positions of power.

31.     This sex discrimination has been especially pronounced toward the Cabarrus Republican Women, a federated Republican club, affiliated with the North Carolina Federation of Republican Women.

32.     The North Carolina Federation of Republican Women ("NCFRW") is an organization separate from the North Carolina Republican Party, though the two entities do, of course, work closely together to advance the cause of the Republican Party generally.   The NCFRW has chapters across the state, including the Cabarrus Republican Women in Cabarrus County.

33.     There is also a North Carolina Federation of Republican Men, ("NCFRM") which has a similar structure as the NCFRW and a similar relationship with the North Carolina Republican Party.

7

34.     Both the NCFRW and the NCFRM are often referred to as "auxiliary" organizations.  The North Carolina Republican Party does not exercise governance or control over these auxiliary organizations, as they are considered separate and distinct entities with their own leadership structures, rules, procedures, budgets, and organizational formalities.

35.     Following the North Carolina State Republican Party's Plan of Organization, the Cabarrus County Republican Party's own Plan of Organization has long provided a seat on its Executive Committee to the President of the local chapter of the Cabarrus Republican Women and likewise to the local men's auxiliary.

36.     Under the Cabarrus County Republican Party's Plan of Organization, the President of the Cabarrus Republican Women holds her seat on the Executive Committee *ex officio* and by virtue of being the leader of the county Republican women's organization.

37.     The granting of a seat on the County Party's Executive Committee to the President of the Republican Women does not give the County Party any right or authority to govern the actions of the Republican Women.  Instead, the Cabarrus Republican Women remains a separate and distinct organization from the Cabarrus County Republican Party.

38.     For several years, Presidents of the Cabarrus Federated Women had rarely attended meetings of the County Party's Executive Committee and

8

had generally maintained distance from it. This passivity seems to have pleased the leaders of the Cabarrus County Republican Party. The County Party knew, however, the incoming President for 2019-20 would be more vocal and involved. Because this CRW President could be expected to insist on her equal rights as a member of the Executive Committee, the male leadership of the County Party resisted and delayed seating her for *four months*.

39. During the four months of delay, Defendants demanded a copy of the CRW's charter.

40. Later, Mrs. Dunbar was unanimously elected as President of the Cabarrus Republican Women. After learning this news, Chairman Ali expressed great frustration to many people, shouting and using expletives like the "f-word" in his outbursts, because he knew that she, too, would not stand for second-class treatment on the Executive Committee. When the meeting at which she was to assume her seat on the Executive Committee commenced, he took the Executive Committee (excluding Mrs. Dunbar) into a closed session for approximately fifteen minutes before reluctantly agreeing to her being seated.

41. The same County Party leadership has also tried to prevent and undermine events hosted by the Cabarrus Republican Women. For example, men from the County Party strongly objected when the CRW announced it would have a booth at the September 2019 County Fair. Women from the CRW

were repeatedly peppered with questions by these men as to why they wanted to have a booth, and the County Party took various steps, hoping to deprive them of their booth, even after the CRW explained why it was needed.

42.     The issue of "party disloyalty" is one that, ostensibly the State and County plans of organization take seriously.   Under the County Plan of Organization, any registered Republican who publicly supports a non-Republican over a Republican in an election can be disqualified from holding party office in the future for up to five years.

43.     "Party disloyalty," however, is a thing of no consequence when it means supporting an Unaffiliated *male* candidate over a Republican *woman*. That is what occurred in a 2019 city council race.   Two members of the Executive Committee openly endorsed and supported the Unaffiliated man over the Republican woman, but they did not receive any form of party discipline.   Chairman Ali (who was then in leadership, but not yet chairman) defended their actions and helped prevent any consequences from befalling the Executive Committee members who supported the non-Republican candidate. Of note, the two arguably "disloyal" Executive Committee members were both women, but they were disloyal in the "right way"—that is, by supporting a man over a woman.

44.     Emblematic of the County Republican Party's crumbling organization, it printed only 1500 sample ballots for 2020 General Election, a

10

woefully inadequate supply that was quickly depleted. When a female Republican candidate printed her own sample ballots, at her own expense, along with the appropriate legend required by law, the male leadership of the County Republican Party responded with great hostility.

45.     In retaliation for her actions, a male member of the County Republican Party leadership changed the locks on the local Republican Party headquarters, barring this candidate from having access to the headquarters and preventing her from getting her campaign supplies that were inside. Members of the County GOP leadership further defamed the female candidate by falsely claiming she had stolen sample ballots belonging to the County Party, and another man from the Party's leadership was sent to a precinct polling place in an effort to intimidate her and take her own sample ballots away from her.

46.     In the most recent 2022 primary election, Chairman Ali provided very strong support to the male candidate over a female candidate in the Republican primary for a District Court judgeship. Even though the male candidate was the incumbent judge, many voters supported the female candidate, not only based on an assessment of relative qualifications, but also because the male candidate would be required to resign his position approximately 15 months into his four-year term, thereby unnecessarily

Case 1:22-cv-00597-LCB-JLW   Document 17   Filed 01/13/23   Page 11 of 33

creating a vacancy due to North Carolina's mandatory retirement age for judges.

47.    In June 2022, the County Party held a meeting on the issue of school board endorsements. Many parents were in attendance. At the beginning of the meeting, a woman from the audience politely asked about the process and related issues. Chairman Ali refused to let her speak and promptly ejected the parents and others in attendance, even calling the police (for no reason), so that there could be a closed session.

48.    Also related to the issue of school board endorsements, Chairman Ali took issue with the CRW hosting a forum at which all Republican candidates could attend, even if they did not have the official endorsement of the County Party. Indeed, this was one of the grounds referenced in the notice seeking Mrs. Dunbar's removal. Yet, around the same time, the Cabarrus Republican Men hosted an event at which all Republican candidates (including those not endorsed by the County Party) were permitted to speak, and Chairman Ali did not seek to punish anyone associated with the Republican Men.

49.    Chairman Ali has a longtime practice of attending events and functions hosted by the Cabarrus Republican Women, often bringing a number of people with him. Neither Ali nor any of the others he brought with him would pay an admittance fee, and Ali would dismissively tell the women

12

working the admissions table words to the effect of, "I'll get that to you later." Despite his promises on these occasions, he would not pay the Cabarrus Republican Women for admission to their events. CRW members have seen this and remarked that it makes them feel demeaned because they would never think of going to a County Party or Men's Club event without paying the admission fee.

50. In one specific instance in May 2022, Chairman Ali came to a CRW fundraiser, which was to support a women's charity. Attendees were asked to pay $10.00 and bring a baby gift. Chairman Ali neither paid the $10.00 nor brought a gift.

51. There is evidence that Chairman Ali's hostility toward women extends outside of political party matters as well. Lisa Matthews is a former Cabarrus County resident, who became involved in a property dispute with the County in her role as a member of a charter school board. Defendant Ali called her to make direct threats, saying that he would personally make it difficult for her to live in the County, and that she "had no idea what could be done" to her and her family. He said to others that Ms. Matthews did not "know how to do what she's told." Ms. Matthews felt like she was specifically targeted because she was a woman in a strong leadership position who would not simply submit to what he demanded.

13

52.   The Cabarrus County Republican Party has also undertaken a practice, accelerated by Chairman Ali, of placing less qualified men in positions of authority in the party.  Some of these men have been teenagers or in their early 20s, and they have lacked substantial real-life experience generally or experience in politics specifically.  Far more qualified women have been passed over for these positions in favor of these men.  This phenomenon is especially troubling, not only because of its sexism, but also because the County Party has serious legal, financial, and regulatory obligations that it must attend to, including managing a relatively large budget, complying with state campaign finance laws (including accurately tracking and reporting contributions in compliance with state law), and working with the local Board of Elections on matters of election administration.

53.   This attitude has certainly not meant that women are excluded from all positions in the County Party.  Those women who are accepted into party positions, though, are not treated equally and generally must submit to the will of the male leadership, especially Chairman Ali.

### Current Sex Discrimination
### Against Mrs. Dunbar

54.   Chairman Ali believes the Cabarrus Republican Women, including Mrs. Dunbar, must do as they are told by him, even though the County Party has no supervisory authority or control over the Cabarrus Republican Women.

14

He does not appear to hold the same controlling attitude toward the Republican men's organization.

55. Chairman Ali's hostility to Mrs. Dunbar is especially ironic given her treatment of him when he first became involved in the local GOP. While some existing members were suspicious of his previously being a Democrat and his criminal record, Mrs. Dunbar took special efforts to make him feel welcome in local party politics.

56. Chairman Ali has, however, now taken aim at Mrs. Dunbar. Organizing several members of the Executive Committee to issue an "official notice" that was undated but emailed to Mrs. Dunbar on July 18, 2022. The individual Defendants named in this lawsuit were listed as having "signed" the notice, though their names were only typed, not signed in ink or by some form of electronic signature.

57. Copied on the July 18 email were other members of the Executive Committee who had not signed the notice.

58. The notice asserts four charges of "gross inefficiency" and stated that Mrs. Dunbar would be given the opportunity to defend herself at a meeting of the Executive Committee, to be held at 6:30 pm, on August 2, 2022, at 96 McGill Ave. NW, Concord.

59. Apparently recognizing the extreme ambiguity of a phrase like "gross inefficiency," the notice *attempts* to define the term:

15

Per guidelines from the Chief Council [*sic*] of the North Carolina Republican Party: "Gross inefficiency is characterized by habitual neglect of power and duties in a position... A member of the County Executive Committee acting outside the will of the Committee could be viewed as neglect of that member's powers and duties."

60. The notice then listed the four alleged bases of Mrs. Dunbar's "gross inefficiency:

    a. As the first ground, Defendants complained that the Cabarrus Republican Women would be hosting a forum for school board candidates and allowing all Republican candidates to attend; Defendants wanted CRW to exclude those candidates they had not endorsed;

    b. In an echo of the first charge, the second charge alleges that it is "gross inefficiency" for the CRW—again, a totally separate organization—to host a forum for school board candidates at all;

    c. The third charge alleges that Mrs. Dunbar "took it upon [her]self to use [her] official capacity as a member of this [Executive] committee to make a public comment" regarding an incident on June 6. Mrs. Dunbar is not aware of what comment this is referring to, but it is entirely false that she

16

used her "official capacity" as a member of the Executive Committee to say anything because she never does that; and

d.  Finally, the gravamen of the fourth charge was hard to discern, but it appears to be that at unspecified times since November 2021 Mrs. Dunbar made generally negative comments, including words to the effect of not "on the same team as the Executive Committee," to fellow members of the Executive Committee.

61.    Thus, in at least the first two charges, Defendants attempted to use their removal power to control the Cabarrus Republican Women, even though it is a totally separate and independent organization from the County Party.

62.    In the latter two charges, Defendants tried to control Mrs. Dunbar's entire ability to think and speak independently of Chairman Ali and the Executive Committee.

63.    Overlooking the fact that Mrs. Dunbar had yet to have a chance to defend herself, the notice further stated: "In sum, your actions represent a habitual neglect of your power and duties as a member of the Executive Committee.  You have actively worked contrary to the efforts of the Executive Committee and its policies—in fact, you have openly stated your desire to work against the Committee.  This will not be tolerated."

17

64. It could not be clearer, of course, that the result of this hearing was a *fait accompli*.

65. The meeting concerning the removal of Mrs. Dunbar proceeded on August 2, 2022.

66. Leading up to the meeting, Mrs. Dunbar had tried multiple times to see if the matter could be mediated or resolved through means other than a formal meeting, but all of her efforts were rebuffed and rejected.

67. At the meeting, there was a presentation by Defendant Lambert that repeated the false statements of the notice along with other false statements. He also cited the instant lawsuit as a reason for the Executive Committee to remove Mrs. Dunbar.

68. Mrs. Dunbar was excluded from the Executive Committee's meeting during its deliberations, even though she is a member of that body.

69. When the vote occurred, the Executive Committee decided to not sustain two of the grounds, but to accept the other two and to remove her from the Executive Committee.

70. Mrs. Dunbar timely appealed the decision to the North Carolina Republican Party Central Committee, but she has been informed by the NCGOP that it will not consider the appeal so long as this lawsuit is pending. Therefore, her appeal remains pending.

71.    Mrs. Dunbar's seat on the Cabarrus County Republican Party's Executive Committee remains empty.

### Political Parties as Actors
### Subject to 42 U.S.C. § 1983

72.    Beginning in the middle of the Twentieth Century, federal courts began closely examining how the organization and functioning of political parties perpetuated racial discrimination. Thus, federal courts struck down primary election schemes by parties that discriminated on the basis of race. These cases reasoned that the state unconstitutionally endorses and adopts discrimination when it accepts onto its ballots the results of racially discriminatory primaries.

73.    Beyond these so-called "white primary cases," the U.S. Supreme Court has also found that a political party's county-based scheme for selecting nominees violated the principle of one person, one vote. And, it has found unconstitutional a requirement that voters pay a registration fee to participate in a primary election.

74.    Though courts are not inclined to meddle with the internal affairs of a political party generally, when state law grants political parties special rights and privileges related to the nomination of candidates and ballot access, the parties' procedures under those laws constitute state action, subject to constitutional limitations and protections.

19

75.    North Carolina law regarding the power of County Party Executive Committees is just such an example of special rights and privileges that, once conferred by state law, come with a requirement that they be discharged in a manner consistent with the United States Constitution.

76.    Under North Carolina election law, County Party Executive Committees elect the individuals to fill vacancies in such offices as State Senate and State Representative, *see* N.C. Gen. Stat. § 163-11, and in filling certain vacancies on the ballot occurring after a nomination but before the election, *see* N.C. Gen. Stat. § 163-114.

77.    The powers given by state law to these County Party Executive Committees is therefore enormous and, in some cases, their actions constitute the election of an official for the balance of the prior officeholder's term.

78.    By excluding Mrs. Dunbar from a process of this nature for discriminatory reasons because of her sex, Defendants are effectively creating a gender gerrymander of the Executive Committee for those times it may be called upon to exercise these statutory powers.

79.    This suit then is not asking the Court to intervene in an intraparty dispute, but rather to preserve the constitutional integrity of a process state statutory law has already specifically put in place for the election of the people's representatives and other government officials.

## COUNT I:
## Sex Discrimination in Violation of the
## Equal Protection Clause of the Fourteenth Amendment
## (42 U.S.C. § 1983)

80.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

81.     The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1. The Equal Protection Clause protects individuals against intentional, arbitrary discrimination.

82.     The rights secured by the Fourteenth Amendment are enforceable pursuant to 42 U.S.C. § 1983.

83.     In light of the special rights and privilege granted to the Cabarrus County Republican Party and its Executive Committee under North Carolina law, its actions are subject to the constrains of the Equal Protection Clause.

84.     At all times relevant to this claim, Defendants were acting under color of state law.

85.     The Fourteenth Amendment prohibits state discrimination on the basis of sex unless such action can be shown to serve important governmental objectives and shown to be substantially related to achievement of those

objectives.  Defendants can make no such showing.  Instead, Mrs. Dunbar is being targeted for removal from her position *because of her sex*.

86.    There is direct evidence of sex discrimination, and Defendants cannot show a legitimate, nondiscriminatory reason for their actions against Mrs. Dunbar.

87.    Mrs. Dunbar is qualified for her position on the Executive Committee; despite being qualified, she is being targeted for discrimination and removal from office; meanwhile, men with the same or lesser qualifications in the County Party are treated more favorably than is Mrs. Dunbar.

88.    Defendants do not have legitimate, nondiscriminatory reason for removing Mrs. Dunbar from her position.

89.    Defendants' justifications for removing her are mere pretext. Indeed, the written allegations against her in the formal notice are so diaphanous they prove that Defendants' true motives are unspeakable—and illicit.

90.    As a direct and proximate result of Defendants' violations of Mrs. Dunbar's rights, Mrs. Dunbar has sustained injuries cognizable at law and in equity, and she is therefore entitled to the relief set out in the prayer for relief below.

**COUNT II:**
**Conspiracy to Interfere with Civil Rights:**
**Obstruction of Justice and Witness Intimidation**
**(42 U.S.C. § 1985(2))**

91.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

92.     Under 42 U.S.C. § 1985(2), it is unlawful for two or more persons to conspire "to injure [a] party or witness in his person or property on account of his having . . . attended or testified" at a proceeding "in any court of the United States."

93.     The same statute also makes it unlawful for two or more persons to conspire "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice . . . with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

94.     The filing of this lawsuit is activity protected under 42 U.S.C. § 1985(2).

95.     After the filing of this lawsuit, Mrs. Dunbar provided testimony in the form of a declaration in support of her motion for preliminary injunction.

96.     Such conduct is protected activity under 42 U.S.C. § 1985(2).

23

97.    The instant lawsuit is an action for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

98.    Upon information and belief, following the filing of this lawsuit and Mrs. Dunbar's testimony, Defendants Ali and Lambert conspired to injure her in her person or property on account of these actions.

99.    Further, upon information and belief, Defendants Ali and Lambert conspired to injure Mrs. Dunbar for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

100.   More specifically, in apparent collusion with Chairman Ali and at his direction, Defendant Lambert gave a presentation to remove Mrs. Dunbar from the Executive Committee at the meeting called for that purpose.  In his comments to the membership, he urged as a basis for removing Mrs. Dunbar the fact that she has filed the instant lawsuit.  The Executive Committee did in fact vote to remove Mrs. Dunbar from her position at that meeting.

101.   Upon information and belief, Mrs. Dunbar's protected activity in this Court did influence members of the Executive Committee of the Defendant Cabarrus County Republican Party to vote in favor of her removal, at least in part because of the remarks made by Defendant Lambert.

24

102. Accordingly, Defendants Ali and Lambert as well as Defendant Cabarrus County Republican Party have injured Mrs. Dunbar in her rights (namely, her right to a position on the Executive Committee) because she engaged in activity protected by 42 U.S.C. § 1985(2).

103. This conspiracy has manifested itself in other forms as well. Chairman Ali has contacted countless individuals active in Republican politics to demean Mrs. Dunbar and describe the instant lawsuit in false terms.

104. Additionally, when Mrs. Dunbar filed her appeal of the decision to remove her to the North Carolina Republican Party's Central Committee, Chairman Ali wrote the members of the Central Committee a letter in which he called the instant lawsuit "unprecedented and completely outrageous action." This was an effort by Chairman Ali to use this lawsuit interfere with Mrs. Dunbar's right to appeal her removal under the procedures provided by the rules of the North Carolina Republican Party.

105. Defendants Ali and Lambert have also tried to replace Mrs. Dunbar on the Executive Committee with another woman (one aligned with them) so as to prevent and otherwise make more difficult the resumption of her position should she prevail.

106. As a direct and proximate result of Defendants' violations of Mrs. Dunbar's rights, Mrs. Dunbar has sustained, and will likely sustain in the

future, injuries cognizable at law and in equity, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT III:
**Breach of Contract / Breach of Covenant
of Good Faith and Fair Dealing
(North Carolina Common Law)**

107. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

108. The course of dealing and the County Party Plan of Organization create a contract between the Cabarrus County Republican Party and the Cabarrus Republican Women and/or Mrs. Dunbar specifically.

109. The Cabarrus County Republican Party's Plan of Organization vests the President of the Cabarrus Republican Women with the right to a seat on the County Party's Executive Committee.

110. A particular person, once seated, may only lose that seat upon the occurrence of certain events, none of which has occurred here.

111. Defendants are nonetheless unlawfully unseated Mrs. Dunbar from the Executive Committee.

112. As a member of the Cabarrus County Republican Party and, more specifically its Executive Committee, Mrs. Dunbar enjoys certain contractual rights based in said membership. *See, e.g., Bright Belt Warehouse Ass'n v. Tobacco Planters Warehouse, Inc.*, 231 N.C. 142, 56 S.E.2d 391 (1949).

26

113.  To the extent that the relevant contract exists only between the Cabarrus County Republican Party and the Cabarrus Republican Women, Mrs. Dunbar is an intended third-party beneficiary of the contract, as it was entered into for her direct, not incident, benefit.

114.  The Cabarrus County Republican Party has materially breached, and threatens to continue materially breaching, that agreement, thereby causing damages to Mrs. Dunbar.

115.  In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything that injures the right of the other to receive the benefits of the agreement.

116.  A special relationship exists between these contracting parties so as to give rise to a covenant of good faith and dealing, which Defendants have breached and threaten to continue to breach.

117.  In particular, Defendants have made baseless allegations and have abused the party disciplinary procedure to remove Mrs. Dunbar from a position she was rightfully entitled to hold.

118.  As a direct and proximate result of Defendants' violations of Mrs. Dunbar's rights, Mrs. Dunbar has sustained, and will likely sustain in the future, injuries cognizable at law and in equity, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT IV:
## Defamation
## (North Carolina Common Law)

119.  The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

120.  The notice signed by Defendants and emailed on July 18, 2022, to Mrs. Dunbar and the entire membership of the Executive Committee publicly defames Mrs. Dunbar.

121.  By the email sent on or about July 18, 2022, and in numerous subsequent repetitions since then, Defendants defamatory statements about Mrs. Dunbar have been published to third persons.

122.  Defendants intended the notice to be taken as allegations of fact by those who read it, not as opinion or hyperbole.

123.  Defendants intended the notice to be allegations setting forth the factual bases for Mrs. Dunbar's removal.

124.  The notice makes several false and defamatory allegations about Mrs. Dunbar, including the following:

> a.  It states she "took it upon [her]self to use [her] official capacity as a member of this [Executive] committee to make a public comment on [an] incident in a light that was negative of the Executive Committee;"

28

b. It accuses her of "habitual neglect of [her] power and duties as a member of the Executive Committee;"

c. It states that she has "actively worked contrary to the efforts of the Executive Committee and its policies;" and

d. It states that she has "openly stated [her] desire to work against the [Executive] Committee."

125. The statements listed in the preceding paragraph are false.

126. Defendants knew these statements were false when they made them or made them with a reckless disregard for the truth.

127. Additionally, the allegation that Mrs. Dunbar has been guilty of "gross inefficiency" is false and defamatory, and Defendants have likewise made this accusation knowing it be true or with a reckless disregard for the truth.

128. Defendants made no good faith investigation into the truth or falsity of these allegations before they made them or, if they did, they ignored the results of any such investigation. Defendants made these statements with the intent of injuring Mrs. Dunbar's reputation and causing her to lose her position.

129. Defendants were not privileged to make the statements at issue.

130. As a direct and proximate result of Defendants' violations of Mrs. Dunbar's rights, Mrs. Dunbar has sustained, and will likely sustain in the

future, injuries cognizable at law and in equity, and she is therefore entitled to the relief set out in the prayer for relief below.

**COUNT V:**
**Declaratory Judgment Relief**
**(28 U.S.C. §§ 2201-02; N.C. Gen. Stat. § 1-253 *et seq.*)**

131. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

132. An actual controversy exists between the parties.

133. A declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties and thereby afford relief from much of the uncertainty and controversy giving rise to this proceeding.

134. At a minimum, the following issues (or substantially similar issues) are ripe and appropriate for declaratory judgment:

Issue 1: Whether the Cabarrus County Republican Party is restricted by the Equal Protection Clause of the Fourteenth Amendment in constituting its Executive Committee?

Issue 2: Whether Mrs. Dunbar has legally enforceable rights pursuant to the Cabarrus County Republican Party's *Plan of Organization*?

135. Accordingly, under 28 U.S.C. §§ 2201-02 and N.C. Gen. Stat. § 1-253 *et seq.*, Rule 57 of the Federal Rules of Civil Procedure, and Rule 57 of the

30

North Carolina Rules of Civil Procedure, Mrs. Dunbar prays for declaratory and related relief declaring and defining the rights among the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Dunbar respectfully prays that this Court grant the following relief:

1. Grant preliminary and permanent injunctive relief;

2. Grant an appropriate declaratory judgment;

3. Grant her a jury trial on all claims so triable;

4. Award her nominal and appropriate compensatory damages for the violation of her rights;

5. Award her prejudgment and post-judgment interest;

6. Award her attorneys' fees and costs pursuant 42 U.S.C. § 1988, N.C. Gen. Stat. §§ 6-21.5 and 6-21.7, and as may be otherwise allowed by applicable law;

7. Tax costs of this action against Defendants; and

8. Grant her such other and further relief as this Court may deem just and proper.

Respectfully submitted, this the <u>13th</u> day of January, 2023.

/s/B. Tyler Brooks
B. Tyler Brooks (N.C. Bar No. 37604)
Attorney for Plaintiff Jennifer Dunbar
LAW OFFICE OF B. TYLER BROOKS, PLLC
P.O. Box 10767

31

Greensboro, North Carolina 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535
Email: btb@btylerbrookslawyer.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed on January 10, 2023, via the Court's CM/ECF system, which will effect service on counsel for the defendants, in accordance with the Federal Rules of Civil Procedure.

/s/B. Tyler Brooks
B. Tyler Brooks


**SERVED:**

James R. DeMay, Esq.
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
900 W. Morgan Street
Raleigh, NC 27603
jdemay@milberg.com