IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:22-cv-00597-LCB-JLW

| | | |
|---|---|---|
| JENNIFER DUNBAR, President of the Cabarrus Republican Women, | ) ) ) | |
| Plaintiff, | ) ) | PLAINTIFF'S RESPONSE TO DEFENDANTS' |
| v. | ) ) | MOTION TO DISMISS AMENDED COMPLAINT |
| ADDUL RAHMAN EL ALI, individually and in his official capacity as Chairman of the Cabarrus County Republican Party; JACK LAMBERT, individually and in his official capacity as Vice Chairman of the Cabarrus County Republican Party; CLAY MAGUIRE, individually and in his official capacity as Secretary of the Cabarrus County Republican Party; and the CABARRUS COUNTY REPUBLICAN PARTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## NATURE OF THE MATTER

This action by plaintiff Jennifer Dunbar seeks to vindicate her right to serve on the Executive Committee of the Cabarrus County Republican Party, but also her right to Equal Protection under the Fourteenth Amendment to the United States Constitution. In August 2022, she was wrongfully removed as a member of that body. Her removal was not any mere wrongful action, however. It was yet another instance of sex discrimination by the Cabarrus County Republican Party. Despite the repeated remonstrations of the County Party that

it can engage in invidious discrimination free of judicial review, precedent in fact establishes that it is required to abide by the Equal Protection Clause in certain of its decisions. Thus, Mrs. Dunbar sues to vindicate her constitutional rights as well as the contractual-based rights she holds under the Cabarrus County Republican Party's *Plan of Organization*.

## QUESTIONS PRESENTED

Whether Defendants have carried their burden of establishing that Plaintiff Jennifer Dunbar's Amended Complaint fails to allege plausible claims for relief (1) under 42 U.S.C. § 1983; (2) under 42 U.S.C. § 1985(2); (3) for breach of contract and/or breach of covenant of good faith and fair dealing; (4) for defamation; and (5) for a declaratory judgment?

## FACTUAL ALLEGATIONS

This is a case about pervasive sex discrimination against women at the hands of the Cabarrus County Republican Party that has become so egregious it has now deprived Jennifer Dunbar, a longtime community activist, of her County Party leadership position and smeared her good name. (D.E. #17: Pl.'s Am. Compl. ¶ 1.) Though Mrs. Dunbar's Amended Complaint describes in detail a history sex discrimination within the Cabarrus County Party, this problem did not come to a head until Defendant Addul Ali, the current County Party Chair, began his term of office as Chairman. (*Id.* ¶¶ 2, 27-31, 41.)

Defendant Ali seems to have a problem with women—or at least, with women who wish to be treated as equals, and specifically with Plaintiff Jennifer Dunbar, President of the Cabarrus Republican Women ("CRW"). (*Id.* ¶ 2.) Mrs. Dunbar holds an *ex officio* seat on the Cabarrus County Republican Party's Executive Committee due to her presidency of the Republican Women. The granting of a seat on the County Party's Executive Committee to the President of the Republican Women does not give the County Party any right or authority to govern the actions of the Republican Women. (*Id.* ¶ 37.) Instead, the Cabarrus Republican Women remains a separate and distinct organization from the Cabarrus County Republican Party.

This seat on the County Party's Executive Committee is hard won. In 2019, the County Party unjustifiably refused to seat the CRW's duly elected president as an ex officio member of the County Party's Executive Committee for four months, while at the same time immediately seating the (18-year-old male) president of the Republican Men's club on the Executive Committee. (*Id.* ¶ 4.) For several years, Presidents of the Cabarrus Federated Women rarely attended meetings of the County Party's Executive Committee and had generally maintained distance from it. (*Id.* ¶ 38.) This passivity seems to have pleased the leaders of the Cabarrus County Republican Party.

The County Party knew, however, the incoming President for 2019-

3

20 would be more vocal and involved. Because this CRW President could be expected to insist on her equal rights as a member of the Executive Committee, the male leadership of the County Party resisted and delayed seating her for four months. (*Id.* ¶ 38.) During the four months of delay, Defendants demanded a copy of the CRW's charter. (*Id.* ¶ 39.)

Later, Mrs. Dunbar was unanimously elected as President of the Cabarrus Republican Women. (*Id.* ¶ 40.) After learning this news, Chairman Ali expressed great frustration to many people, shouting and using expletives like the "f-word" in his outbursts, because he knew that she, too, would not stand for second-class treatment on the Executive Committee. (*Id.*) When the meeting at which she was to assume her seat on the Executive Committee commenced, he took the Executive Committee (excluding Mrs. Dunbar) into a closed session for approximately fifteen minutes before reluctantly agreeing to her being seated. (*Id.*)

Chairman Ali and the County Party's practice of discriminating against women has manifested itself in many forms—for example:

> a. The County Party failed to follow party procedures for censuring "party disloyalty" when two Executive Committee members openly supported the election of an unaffiliated *man* over a Republican *woman*;
>
> b. A female Republican candidate, who printed her own sample

ballots, at her own expense, along with the appropriate legend required by law, was accosted by a member of the male leadership of the County Republican Party, acting on the Party's behalf; another man from Party changed the locks on the Party headquarters to keep this female candidate from obtaining her own campaign materials; the Party took no steps to address (and seems in fact to have directed) this threatening and inappropriate behavior toward the female candidate;

c. In the 2022, Chairman Ali provided very strong support to the male candidate over a female candidate in the Republican primary for a District Court judgeship. Many GOP voters supported the female candidate, because the male candidate would be required to resign his position approximately 15 months into his four-year term, thereby unnecessarily creating a vacancy due to North Carolina's mandatory retirement age for judges;

d. Chairman Ali and the County Party sought removal of Mrs. Dunbar from her Executive Committee position for the Republican Women club hosting a forum where all Republican Board of Education candidates could attend.

5

Yet, around the same time, the Cabarrus Republican Men hosted an event at which all Republican candidates (including those not endorsed by the County Party) were permitted to speak, and Chairman Ali did not seek to punish anyone associated with the Republican Men; and

e. Chairman Ali has a practice of attending local women's events, often with a group of other individuals with him, and failing to pay for any admission, which the women hosting the event find to be demeaning.

(*Id.* ¶ 42-50.)

Chairman Ali's hostility toward women extends outside of strictly political party matters as well. (*Id.* ¶ 51.) Lisa Matthews, a former Cabarrus County resident, who became involved in a property dispute with the County in her role as a member of a charter school board was personally threatened by Defendant Ali when he called her to say that he would personally make it difficult for her to live in the County and that she "had no idea what could be done" to her and her family. (*Id.*) He said to others that Ms. Matthews did not "know how to do what she's told." (*Id.*) Ms. Matthews has previously testified in this matter that she feels she was specifically targeted because she was a woman in a strong leadership position who would not simply submit to what Addul Ali demanded. (*Id.*)

6

The County Party has also undertaken a practice, accelerated by Chairman Ali, of placing less qualified men in positions of authority in the party. (*Id.* ¶ 52.) Some of these men have been teenagers or in their early 20s, and they have lacked substantial real-life experience generally or experience in politics specifically. (*Id.*) Far more qualified women have been passed over for these positions in favor of these men. (*Id.*)

Defendants' attitude has certainly not meant that women are excluded from all positions in the County Party. (*Id.* ¶ 52.) Those women who are accepted into party positions, though, are not treated equally and generally must submit to the will of the male leadership, especially Chairman Ali. (*Id.* ¶ 52.)

Emblematic of this very point is the treatment of Mrs. Dunbar that gives rise to the instant lawsuit. Chairman Ali believes the Cabarrus Republican Women, including Mrs. Dunbar, must do as they are told by him, even though the County Party has no supervisory authority or control over the Cabarrus Republican Women. (*Id.* ¶ 54.) He does not appear to hold the same controlling attitude toward the men's auxiliary organization. (*Id.*)

On July 18, 2022, Mrs. Dunbar received by email an "official notice" from the Secretary of County Party. (*Id.* ¶ 56.) It was signed by Chairman Ali and a mostly male selection of members of the County Party's Executive

Committee. The "official notice" required Mrs. Dunbar to appear on August 2, 2022, before the Executive Committee to defend herself against ambiguous charges of "gross inefficiency," which—when distilled to their essence—really assert nothing more than that Mrs. Dunbar is guilty of not submitting herself and the Cabarrus Republican Women to Chairman Ali's will. (*Id.* ¶¶ 60-62.) The notice asserts four charges of "gross inefficiency" and stated that Mrs. Dunbar would be given the opportunity to defend herself at a meeting of the Executive Committee, to be held at 6:30 pm, on August 2, 2022.

In at least the first two charges, Defendants attempted to use their removal power to control the Cabarrus Republican Women, even though it is a totally separate and independent organization from the County Party. (*Id.* ¶ 61.) In the latter two charges, Defendants tried to control Mrs. Dunbar's entire ability to think and speak independently of Chairman Ali and the Executive Committee. (*Id.* ¶ 62.)

Overlooking the fact that Mrs. Dunbar had yet to have a chance to defend herself, the notice stated: "In sum, your actions represent a habitual neglect of your power and duties as a member of the Executive Committee. You have actively worked contrary to the efforts of the Executive Committee and its policies—in fact, you have openly stated your desire to work against the Committee. This will not be tolerated." (*Id.* ¶ 63.)

8

The meeting to consider the removal of Mrs. Dunbar proceeded on August 2, 2022. (*Id.* ¶ 65.) Leading up to the meeting, Mrs. Dunbar had tried multiple times to see if the matter could be mediated or resolved through other means, but all her efforts were rebuffed and rejected out of hand by Defendants. (*Id.* ¶ 66.)

At the meeting, there was a presentation by Defendant Lambert that repeated the false statements of contained in the Notice along with other false statements. He also cited the instant lawsuit as a reason for the Executive Committee to remove Mrs. Dunbar and urged members to retaliated against her for filing the suit. (*Id.* ¶ 67.) Mrs. Dunbar was excluded from the Executive Committee's meeting during its deliberations, even though she is a member of that body. (*Id.* ¶ 68.) When the vote occurred, the Executive Committee decided to not sustain two of the grounds, but to accept the other two and to remove her from the Executive Committee. (*Id.* ¶ 69.)

Mrs. Dunbar timely appealed the decision to the North Carolina Republican Party Central Committee, but she has been informed by the NCGOP that it will not consider the appeal so long as this lawsuit is pending.[1] (*Id.* ¶ 70.) Therefore, Mrs. Dunbar's seat on the Cabarrus

---

[1] Defendants' brief states, "Plaintiff has curiously elected to indefinitely delay that appeal in favor of this lawsuit, as Plaintiff contends that her appeal cannot be heard while this lawsuit is pending." (Defs.' Br. 18.) Mrs. Dunbar's Amendment Complaint

County Republican Party's Executive Committee remains empty. (*Id.* ¶ 71.)

Even after the filing of Mrs. Dunbar's last Amended Complaint, the facts on this case have continued to develop. By motion to be filed presently, Mrs. Dunbar will seek to amend her complain again to add the new facts that developed just in the last week—namely, that Defendant Ali is now running for Vice Chair of the North Carolina Republican Party (a statewide party position) against a female incumbent. The female incumbent is a well-respected party activist and full-time public-school teacher with a long record of public service. Even though the position of Vice Chair of the NC GOP has traditionally been held by a woman, Chairman Ali has decided to break with this recent practice, likely depriving women of either of the top two positions in the State GOP, should he win the election. Furthermore, the current Vice Chair is an active member of the North Carolina Federation of Republican Women, thus meaning a win by Chairman Ali would significantly reduce the influence of that organization in the NC Republican Party. Thus, Chairman Ali's

---

is clear that "she has been informed by the NCGOP that it will not consider the appeal so long as this lawsuit is pending." (Am. Compl. ¶ 70.) Therefore, contrary to the suggestion Defendants wish to make about Mrs. Dunbar, she wishes to have her appeal heard by the NCGOP as soon as possible; discovery from the NCGOP as to why *it* (not Mrs. Dunbar) inexplicably delayed hearing her appeal would no doubt be useful on this point.

recent actions further evidence, and make more plausible the allegation, that he repeatedly seeks to reduce the influence of independent women in Republican Party politics.

## STANDARD OF REVIEW

A motion to dismiss a complaint under Rule 12(b)(6) tests the legal sufficiency of the allegations contained in a plaintiff's complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). In considering a Rule 12(b)(6) motion, the court accepts as true all well-pleaded factual allegations and construes those allegations in the light most favorable to the plaintiff. *See Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S. Ct. 1827, 1832 (1989); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Thus, the complaint must contain sufficient facts that, if assumed to be true, state a claim for relief "that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Nevertheless, the plaintiff's complaint must not rely merely on labels, conclusions, or a bare recitation of a cause of action's elements; otherwise, dismissal of the complaint is appropriate. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 1949-50 (2009) (discussing *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955).

11

# ARGUMENT

## I. MRS. DUNBAR'S COMPLAINT STATES A PLAUSIBLE CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE UNDER 42 U.S.C. § 1983 BECAUSE THE NORTH CAROLINA REPUBLICAN PARTY IS IN FACT SUBJECT TO CERTAIN CONSTITUTIONAL RESTRICTIONS.

### A. North Carolina Political Parties Cannot Effect A "Gender Gerrymander" Of Their Executive Committees.

First, Mrs. Dunbar states a valid cause of action under the Equal Protection Clause. In the Twentieth Century, federal courts began closely examining how the organization and functioning of political parties perpetuated racial discrimination. Thus, federal courts struck down primary election schemes by parties that discriminated on the basis of race. *Terry v. Adams*, 345 U.S. 461, 62-63 (1953) (plurality opinion); *Smith v. Allwright*, 321 U.S. 649, 656-57 (1944); *Nixon v. Condon*, 286 U.S. 73, 88-89 (1932). These cases reasoned that the state unconstitutionally endorses and adopts discrimination when it accepts onto its ballots the results of racially discriminatory primaries. *See Smith*, 321 U.S. at 664.

Beyond these so-called "white primary cases," the U.S. Supreme Court has also found that a political party's county-based scheme for selecting nominees violated the principle of one person, one vote. *Gray v. Sanders*, 372 U.S. 368, 374-75 (1963). And, it has found unconstitutional a requirement that voters pay a registration fee to participate in a primary election. *Morse v. Republican Party of Va.*, 517 U.S. 186, 197-99 (1996); *see Bullock v. Carter*, 405 U.S. 134, 148-49

(1972) (striking down Texas law requiring that candidates in primary elections pay a filing fee to be placed on ballot).

Though courts are not inclined to meddle with the internal affairs of a political party generally, when state law grants political parties special rights and privileges related to the nomination of candidates and ballot access, the parties' procedures under those laws constitute state action, subject to constitutional limitations and protections. *See Gray*, 372 U.S. at 374 ("[T]he action of this [political] party in the conduct of its primary constitutes state action within the meaning of the Fourteenth Amendment."); *Rockefeller v. Powers*, 74 F.3d 1367 (2d Cir. 1995) (reviewing constitutionality of state enacted scheme for selecting delegates to Republican Party Convention).

North Carolina law regarding the power of County Party Executive Committees is just such an example of special rights and privileges that, once conferred by state law, come with a requirement that they be discharged in a manner consistent with the United States Constitution. Under North Carolina election law, County Party Executive Committees elect the individuals to fill vacancies in such offices as State Senate and State Representative, *see* N.C. Gen. Stat. § 163-11, and in filling certain vacancies on the ballot occurring after a nomination but before the election, *see* N.C. Gen. Stat. § 163-114. The powers given by state law to these County Party Executive Committees is therefore enormous and, in some cases, their actions constitute the direct selection of an

13

official for the balance of the prior officeholder's term. *See Smith*, 321 U.S. at 663 ("The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party."). These laws in fact grant more direct power, and thus implicate greater state action, than simply conducting a primary, since in some cases the Executive Committee is literally installing a new officeholder.

By excluding Mrs. Dunbar from a process of this nature for discriminatory reasons because of her sex, Defendants are effecting a gender gerrymander of the Executive Committee for those times it may be called upon to exercise these statutory duties. Defendants, though, would have this Court rule that, notwithstanding this important statutory power, political parties could exclude members from their Executive Committees based on factors such as race or sex. Fortunately, the Supreme Court has made clear that the Constitutions forbids such a result.

## B. Discrimination In The Selection Of Party Officials Who Exercise Governmental Powers Is Redressable Under 42 U.S.C. § 1983.

This suit is not asking the Court to intervene in a mere intraparty dispute, but rather to preserve the constitutional integrity of a process state statutory law has already put in place for the election of the people's representatives and other government officials. Mrs. Dunbar was targeted for removal from her position because she is a woman. Defendants' actions therefore violate the Equal Protection Clause, which is enforceable pursuant to 42 U.S.C. § 1983 and which

14

protects individuals against intentional, arbitrary discrimination. U.S. Const., amend. XIV, § 1 (providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws").

The caselaw cited by Defendants in their brief is unavailing for their argument. Defendant's chief authority, *Banchy v. Republican Party of Hamilton County*, 898 F.2d 1192 (6th Cir. 1990), actually underscores Mrs. Dunbar's principal point on state action. There, the Sixth Circuit recognized how a political party organization could be a state actor when engaged in governmental functions like filling a vacancy in an elected office. 898 F.2d at 1194-95. The plaintiffs in *Banchy* could not prevail, though, because they challenged the process by which party elections had occurred to the party *executive* committee, even though it was the party *central* committee that engaged in governmental functions like filling vacancies in political offices. The connection between these two committees was too tenuous to find that there was state action in the composition in the former due to the duties of the latter.

Mrs. Dunbar is not arguing that the Cabarrus County Republican Party or even its Executive Committee is a state actor for *all* purposes. But, she is challenging the means by which the composition of the Executive Committee has been determined because members of the County's Executive Committee do engage in governmental functions. Invidious discrimination in the selection of the members who exercise those governmental powers is the functional

15

equivalent of the "white primaries" that have long been constitutionally proscribed. *Bauchy* supports, rather, than undermines this contention.

Furthermore, Defendants' First Amendment argument regarding the right to association argument should be rejected since the Platform of the Republican Party calls for equal rights for both sexes. *See* 2022 Platform, North Carolina Republican Party, *available at* https://assets.nationbuilder.com/ncgop/pages/4317/attachments/original/165530 4356/2022_NCGOP_Platform_-_Adopted.pdf?1655304356 (last visited Feb. 24, 2023) ("Government should treat all citizens impartially and equally under the law. Unjust discrimination is detrimental to freedom for all individuals and we oppose it in any form."). Thus, no Republican Party entity—county, state, or even federal—can defend sex discrimination on the basis of it being a First Amendment right of the organization without violating the official tenets of the Republican Party. Only an entity that opposed women's equality could make such an argument under the First Amendment, and presumably Defendants do not wish to take that position here.

## C. Mrs. Dunbar's Complaint Plausibly Alleges Sex Discrimination.

To show a claim of sex discrimination under the Equal Protection Clause, a plaintiff must show she was "treated differently from others with whom [she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination" as well as that "the disparity was not justified

16

under the appropriate level of scrutiny." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020). Title VII's analytical framework can be instructive for claims of sex discrimination under the Equal Protection Clause. *See, e.g., Wilcox v. Lyons*, 970 F.3d 452, 462 (4th Cir. 2020) ("Title VII's antidiscrimination provision overlaps the ambit of the Equal Protection Clause, and we have applied a similar framework in analyzing workplace protected-characteristic discrimination claims under each[.]").

Here, Mrs. Dunbar is qualified for her position on the Executive Committee. The County Party's Plan of Organization makes her a member of the Executive Committee by virtue of her office as President of the CRW. Moreover, she is a talented and hard-working party volunteer.

The fact that Defendants formally charged her with the purported offense of "gross inefficiency" constitutes an admission by them that they could only have removed her "for cause." But, when Defendants' allegations are examined, they crumble. In the first two charges, they take issue with the CRW holding a Republican candidates forum—this, of course, is what political organizations do. That is effectiveness, not inefficiency. As to the question of not excluding the non-party endorsed candidates from the CRW event, the Republican Men's Club has held at least one event where non-endorsed candidates presented, and no discipline has come to its head.

The other charges all relate to the ability of Mrs. Dunbar to express an opinion different from that of the Party Chairman. For a party chairman who has previously defended those who backed the election of an Unaffiliated man over a Republican woman, these charges sound less like wanting party loyalty and more like an antiquated belief that women should simply do as they are "told." Ms. Matthews experience with Chairman Ali goes so far as to describe how he used that description of her, which she understood to be a sex-based stereotype due to her being a woman in a position of authority, who was taking a position opposed to him.

Such behavior is consistent with Chairman Ali's dismissive attitude toward CRW events, where he refuses to pay and even allows others to enter without paying, causing the women volunteering to feel demeaned and insulted. "Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 130-31 (1994).

That Chairman Ali could secure the backing of other Executive Committee members for his effort to oust Mrs. Dunbar is not surprising when the history of the County Party is considered. Women, and the CRW, have had difficulty with the County Party for years. The County Party has tried to stop its events,

Case 1:22-cv-00597-LCB-JLW   Document 21   Filed 02/24/23   Page 18 of 28

subjected them to criticism, and even delayed seating the President of the CRW for *four months*, even though it immediately seated an 18-year-old men's club chairman at the same time. Indeed, younger, less qualified men have been placed in positions of authority, while more experienced women have been passed over by the County Party.

The weakness in the charges against Mrs. Dunbar shows that they are mere pretext for seeking to remove her from her seat and the reason is she is a strong woman. And, removing her from her seat because she is a strong woman cannot satisfy intermediate scrutiny.

Curiously, Defendants seem to rely on the idea that because *some* women are not discriminated against by Defendants that it is impossible for Mrs. Dunbar to be discriminated against on the basis of sex by Defendants as well as the defense that because other women participated in the alleged discrimination against Mrs. Dunbar it must not have been based on sex. This is a theory long since rejected by the courts. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78-79 (1998). Perhaps more importantly, though, Defendants fail to grasp that Defendants are engaged in discrimination against women who fail to submit to men—that is, who fail to adhere to stereotypical gender roles and stereotypes. *See, e.g., Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 608-09 (4th Cir. 2020) (collecting cases).

19

Accordingly, Mrs. Dunbar more than adequately states a claim under 42 U.S.C. § 1983 for violation of her rights against sex discrimination under the Equal Protection Clause of the Fourteenth Amendment. The motion to dismiss should be denied.

## II. MRS. DUNBAR HAS BEEN RETALIATED AGAINST FOR HER PROTECTED ACTIVITY IN VIOLATION OF 42 U.S.C. § 1985(2).

The core of Count II in Plaintiff's Amended Complaint is clear: When Mrs. Dunbar stood up for her federally protected rights and sought the protections of this Court, Defendants used that action to smear and retaliate against her. Federal law prohibits the course of action that Defendants elected to pursue against Mrs. Dunbar.

Under 42 U.S.C. § 1985(2), it is unlawful for two or more persons to conspire "to injure [a] party or witness in his person or property on account of his having . . . attended or testified" at a proceeding "in any court of the United States." The same statute also makes it unlawful for two or more persons to conspire "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice . . . with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

In addition to filing her complaint and seeking injunctive relief, Mrs. Dunbar also provided testimony to this Court in the form of a declaration. (*See*

D.E. #1 & D.E. #2.)  Soon thereafter, Defendant Lambert, in presenting the case to the County Executive Committee for the Defendants (and others who had charged Mrs. Dunbar with misconduct) "*urged as a basis* for removing Mrs. Dunbar the fact that she had filed the instant lawsuit."  (Am. Compl. ¶ 100.)  Thus, Defendants retaliated against Mrs. Dunbar *because of* her exercise of her federally protected rights—an action that violated 42 U.S.C. § 1985(2).

Furthermore, an "agreement" among Defendants (or at least evidence of it) to work together on the effort to remove Mrs. Dunbar is clearly found in the document (*i.e.*, the "Notice") they themselves signed their names to when seeking to remove her.  When Defendants do not even deny the existence of the document that evidences the Defendants' agreement to take action against the victim, there can hardly be a "conclusory" allegation of a conspiracy.  Furthermore, Defendant Lambert was the agreed-up spokesperson for those (including Defendants) who signed the Notice in making the case against Mrs. Dunbar, and then retaliated against Mrs. Dunbar for her exercise of federally protected rights.

Defendants' minds plainly met with the intent of removing Mrs. Dunbar from her rightful position on the Executive Committee.  This is a more than plausible allegation, *see Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011), and Defendants' motion should be denied.

21

### III. MRS. DUNBAR'S COMPLAINT PLAUSIBLY ALLEGES CONTRACT-BASED CLAIMS THAT ARE WELL-ESTABLISHED IN NORTH CAROLINA LAW.

Additionally, Mrs. Dunbar's claims based on a theory of contract and breach of the covenant of good faith and faith dealing are well-grounded in North Carolina law. State law has long recognized the contractual nature of membership in an organization, and when it is unduly denied, the member has a legal claim sounding in contract. *See, e.g., Bright Belt Warehouse Ass'n v. Tobacco Planters Warehouse, Inc.*, 231 N.C. 142, 56 S.E.2d 391 (1949); *Cape Hatteras Elec. Membership Corp. v. Stevenson*, 2015 NCBC 34, 2015 NCBC LEXIS 37 (N.C. Sup. Ct. Apr. 9, 2015).

The County Party's *Plan of Organization* supplies the contractual basis for Mrs. Dunbar's claims, both as a party to the contract (due to being a member of the County Party) and as a third-party beneficiary of the County Party's contractual relationship with the Cabarrus Republican Women.

Defendants assert in their brief that they "complied" with the County *Plan*, but that is the very issue of the case—Mrs. Dunbar says they did not, through the various violations described in her Amended Complaint. Defendants' response to this claim seems only to be that they did not breach the contract, but that is classic question begging. It will take discovery and further litigation to determine this dispute between the parties.

22

Defendants further make a passing reference to the fact that Mrs. Dunbar's appeal to the NCGOP is still pending and then proceed to make the specious claim that Mrs. Dunbar is not currently injured even though she is being denied her seat on the Executive Committee.  To the contrary, the *State* Party may later agree with Mrs. Dunbar and reverse the injustice worked by the Defendants, but that will not mean the *County* did not work an injustice to be rectified.  And, while she is denied her seat, she is injured, as are the members of the Cabarrus Republican Women who are also being denied a voice on the County Executive Committee.

Thus, Mrs. Dunbar plainly states plausible claims for breach of contract and breach of the covenant of good faith and fair dealing.

**IV. MRS. DUNBAR'S AMENDED COMPLAINT STATES PLAUSIBLE CLAIMS FOR DEFAMATION UNDER STATE LAW, AND A DECLARATORY JUDGMENT IS ALSO APPROPRIATE.**

**A. Mrs. Dunbar Has Been Defamed By Defendants.**

*1. Defendants Enjoy No Privilege For Their Defamation.*

Ironically for Defendants whose who argument for dismissal of the other claims in the Amended Complaint are premised on their not being governmental actors, when it comes to Mrs. Dunbar's defamation claims they turn on a dime to paint the proceedings to remove her as some sort of "judicial" proceeding. Unsurprisingly, Defendants' case law fails to support their novel take.

Case 1:22-cv-00597-LCB-JLW   Document 21   Filed 02/24/23   Page 23 of 28

Defendants' only two cases are wholly inapposite. In *Topping v. Meyers*, 270 N.C. App. 613, 842 S.E.2d 95 (2020), the North Carolina Court of Appeals gave the litigation privilege a rather limited reach and accorded an absolute litigation privilege only to "statements asserted in a pleading filed with the trial court and invoking judicial process." *Id.* at 624, 842 S.E.2d 95. Obviously, those are not the materials at issue here. The case says nothing about immunizing statements in political party meeting. Similarly, the limited privilege recognized in *Bouligny, Inc. v. Steelworkers*, 270 N.C. 160, 170-71, 154 S.E.2d 344, 354 (1967), applies to certain statements made in the course of labor union elections conducted under federal law. No federal law alters the application of North Carolina common law in this case. Finally, privilege is an affirmative defense to be proved by the defendant, and thus is it not commonly an appropriate basis for a dismissal under Rule 12(b)(6). *See id.* at 173, 154 S.E.2d 344.

### 2. *The Statements Made Are Actionable As Defamation.*

In the Notice sent to Mrs. Dunbar setting the Party meeting to remove her from the County Executive Committee, Defendants meant not to offer mere *opinions*, but to charge the *facts* of which Mrs. Dunbar was guilty. Indeed, the Executive Committee would soon proceed to find her "guilty" on two of the four grounds and remove her from the Committee for those reasons.

Now that Defendants are being taken at their word, Defendants wish for their words to have no meaning. North Carolina law is not so cynical. "In

24

determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made." *Daniels v. Metro Magazine Holding Co., L.L.C.,* 179 N.C. App. 533, 539-40, 634 S.E.2d 586 (2006) (citation omitted); *cf. Craven v. SEIU COPE*, 188 N.C. App. 814, 818, 656 S.E.2d 729 (2008). Here, Defendants were making formal allegations, in accordance with their organization's procedures, that were then intended to be evaluated and judged by other members of the same organization, according to its governing documents. Thus, accusing her of "habitual neglect," "gross inefficiency," and actively working contrary to the efforts of the Executive Committee are meant to be facts that *the Defendants themselves* intended to soon prove at a meeting, not mere opinion commenting on Mrs. Dunbar's job performance. (And, if Defendants are to be believed, they did prove two of the four "charges" to the Executive Committee.) This then was neither taken, nor intended to be taken, as "loose, figurative, or hyperbolic language." *Daniels* 179 N.C. App. at 540, 634 S.E.2d 586.

Defendants further overlook the clear statements of fact that they falsely levelled against her in the notice, including accusing Mrs. Dunbar of "openly stat[ing] [her] desire to work against the [Executive] Committee," which Mrs. Dunbar denies ever saying. This is an accusation with connotations of party disloyalty, which can result in severe party sanctions.

Case 1:22-cv-00597-LCB-JLW   Document 21   Filed 02/24/23   Page 25 of 28

Thus, Defendants have defamed Mrs. Dunbar, and this claim should not be dismissed.

**B. Declaratory Judgment Relief Is Appropriate.**

Mrs. Dunbar's declaratory judgment claims should also remain as they ask the Court to clarify issues that will assist the parties in resolving these matters, particularly as the appeal to the North Carolina Republican Party remains pending.

## CONCLUSION

WHEREFORE, Mrs. Dunbar respectfully requests that Defendants' motion to dismiss her Amended Complaint be denied, that this case be permitted to proceed to discovery on Mrs. Dunbar's claims, and that Mrs. Dunbar be granted such other and further relief as the Court may deem appropriate.

Respectfully submitted, this the 24th day of February, 2023.

/s/B. Tyler Brooks
B. Tyler Brooks (N.C. Bar No. 37604)
Attorney for Plaintiff Jennifer Dunbar
LAW OFFICE OF B. TYLER BROOKS, PLLC
P.O. Box 10767
Greensboro, North Carolina 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535
Email: btb@btylerbrookslawyer.com

## CERTIFICATE OF WORD COUNT COMPLIANCE

The undersigned counsel certifies that the foregoing brief complies with Local Civil Rule 7.3(d) in that, according to the word count feature of his word processing software, it contains less than 6,250 words, excluding those parts that are allowed to be excluded by the Rule. According to such software, this brief contains 6,057 words.

/s/B. Tyler Brooks
B. Tyler Brooks

Case 1:22-cv-00597-LCB-JLW   Document 21   Filed 02/24/23   Page 27 of 28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed on February 24, 2023, via the Court's CM/ECF system, which will effect service on counsel for the defendants, in accordance with the Federal Rules of Civil Procedure.

/s/B. Tyler Brooks
B. Tyler Brooks

**SERVED:**
James R. DeMay, Esq.
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
900 W. Morgan Street
Raleigh, NC 27603
jdemay@milberg.com